Matter of People of the State of New York v Schofield (2021 NY Slip Op 04785)





Matter of People of the State of New York v Schofield


2021 NY Slip Op 04785


Decided on August 26, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:August 26, 2021

533467

[*1]In the Matter of The People of the State of New York, by Letitia James, as Attorney General of the State of New York, Respondent,
v
Jason Schofield, Individually and as Commissioner of the Rensselaer County Board of Elections, et al., Appellants. Troy Branch of the National Association for the Advancement of Colored People et al., Proposed Intervenors.

Calendar Date:August 18, 2021

Before: Garry, P.J., Lynch, Clark, Pritzker and Colangelo, JJ.


David Gruenberg, Troy, and Carl J. Kempf III, County Attorney, Troy, for appellants.
Letitia James, Attorney General, Albany (Sarah L. Rosenbluth of counsel), for respondent.
New York Civil Liberties Union Foundation, New York City (Perry Grossman of counsel), for proposed intervenors.


Garry, P.J.
(1) Appeal from a judgment of the Supreme Court (Silverman, J.), entered June 7, 2021 in Rensselaer County, which granted petitioner's application, in a proceeding pursuant to CPLR article 78, to, among other things, annul a determination of respondent Rensselaer County Board of Elections designating polling places for early voting pursuant to Election Law § 8-600 (2), and (2) motion to intervene.
In 2019, the Legislature provided that, with limited exceptions, persons registered and eligible to vote in any general or primary election would be permitted to cast their ballots in the 10 days prior to the election (see Election Law § 8-600 [1], as added by L 2019, ch 6, § 8). To ensure that the early voting option would be fully available, county boards of elections were directed to "designate[] at least one early voting polling place for every full increment of [50,000] registered voters in each county" (Election Law § 8-600 [2] [a]). Rensselaer County has approximately 109,000 registered voters. During the 2019 election cycle, respondent Rensselaer County Board of Elections (hereinafter the Board) sited two early voting polling places. Each of these sites was in a suburban location that was difficult to reach via public transportation from the City of Troy, Rensselaer County (hereinafter the City), the County's most populous municipality and home to almost a quarter of its actively enrolled voters. For the 2020 election cycle, the Board belatedly addressed concerns raised by elected officials and various community and public interest groups regarding the lack of an early voting polling place in the City — and pending legislative efforts that would force the Board to designate such a polling place (see 2019 NY Assembly Bill A8610-B; 2019 NY Senate Bill S8782) — by establishing a third early voting polling place in the City's southeastern corner, at the Holy Cross Armenian Church. The Board subsequently adhered to these designated polling places despite repeated complaints from petitioner and others — mainly a coalition of community groups that included proposed intervenor Troy Branch of the National Association for the Advancement of Colored People (hereinafter the NAACP). These groups vigorously asserted that Holy Cross did not satisfy the statutory criteria for early voting polling places (see Election Law § 8-600 [2]), and that a polling place should either be relocated to, or established in, a location more readily accessible to City residents.
After the 2020 election cycle concluded, Election Law §
8-600 was amended to specifically require that county boards of elections situate at least one early voting polling place in "the municipality with the highest population in each county," located along public transportation routes if existent (Election Law § 8-600 [2] [a], as amended by L 2020, ch 344, § 1). Thereafter, in April 2021, petitioner, the NAACP and various groups proposed four sites for early voting in the City, any one of which [*2]they asserted was "a significant improvement over prior early voting plans in terms of meeting the requirements for equitable access defined in Election Law § 8-600 (2)." Respondents Jason Schofield and Edward McDonough, the Commissioners of the Board, responded that they had met with representatives from the four proposed "sites to determine availability and whether they met all of the required specifications," but they continued to believe that the Holy Cross site complied with the established legal requirements and was the best option for Rensselaer County residents.
Petitioner commenced this CPLR article 78 proceeding to challenge the Board's determination as to the early voting polling places for the 2021 primary and general elections and to obtain injunctive and other relief. Following joinder of issue, Supreme Court annulled the Board's determination that the early voting polling places selected for the 2021 primary and general elections afforded "adequate and equitable access for all voters in Rensselaer County" and directed the Board to select new locations that satisfied the requirements of Election Law §
8-600. Respondents appeal. On June 24, 2021, in response to motions seeking various relief, this Court, among other things, granted petitioner's motion to vacate the automatic stay afforded by CPLR 5519 (a) (1). Thereafter, the NAACP and three City residents who are registered voters moved to intervene as petitioners. We now decide that motion and the appeal.
First, with respect to the motion to intervene, "a court 'may allow other interested persons' to intervene in a special proceeding" and "[p]ermission to intervene in [a CPLR] article 78 proceeding may be granted at any point of the proceeding, including after judgment for the purposes of taking an appeal" (Matter of Greater N.Y. Health Care Facilities Assn. v DeBuono, 91 NY2d 716, 720 [1998], quoting CPLR 7802 [d]; see Matter of Romeo v New York State Dept. of Educ., 39 AD3d 916, 917 [2007]; Matter of Elinor Homes Co. v St. Lawrence, 113 AD2d 25, 28 [1985]). The "interested persons" standard of CPLR 7802 (d) is "more liberal than that provided in CPLR 1013" for intervention in other civil actions (Matter of Tennessee Gas Pipeline Co. v Town of Chatham Bd. of Assessors, 239 AD2d 831, 832 [1997]; see Matter of Greater N.Y. Health Care Facilities Assn. v DeBuono, 91 NY2d at 720; Matter of Ball v Town of Ballston, 173 AD3d 1304, 1306 [2019], lv denied 34 NY3d 903 [2019]). This Court is "vested with all the power of Supreme Court to grant [a] motion for intervention" (Auerbach v Bennett, 47 NY2d 619, 628 [1979]; see Matter of Clinton v Summers, 144 AD2d 145, 147 n [1988]), and "this permissive determination lies within the [C]ourt's discretion" (Matter of Pace-O-Matic, Inc. v New York State Liq. Auth., 72 AD3d 1144, 1145 [2010]; see Matter of Clinton v Summers, 144 AD2d at 147 n). "[W]hen deciding whether to grant such a request, a court may properly balance the benefit to [*3]be gained by intervention, and the extent to which the proposed intervenor may be harmed if it is refused, against other factors, such as the degree to which the proposed intervention will delay and unduly complicate the litigation" (Matter of Pier v Board of Assessment Review of Town of Niskayuna, 209 AD2d 788, 789 [1994]), and whether any party would be prejudiced (see Jones v Town of Carroll, 158 AD3d 1325, 1328 [2018], lv dismissed 31 NY3d 1064 [2018]).
The three individual proposed intervenors are minority and/or disabled City residents who rely upon public transportation. They aver as to their preference to take advantage of early voting and as to how their ability to do so will be hampered by the locations of the early voting polling places chosen by the Board. The president of the NAACP submitted an affidavit explaining that promoting and protecting voting rights is a critical part of the NAACP's mission, and setting forth how the location of early voting polling places in Rensselaer County impacts both specific NAACP members and other voters of color. Finding that all four proposed intervenors have thus established that they qualify as "interested persons," we must next determine whether to exercise our discretion to permit them to intervene.
Although the motion to intervene was filed quite late in the process, which we do not condone, we note that the NAACP had been informally involved with this situation for two years, writing letters to respondents and expressing its concerns with the selections and selection process for early voting sites. The record contains an affidavit from an individual who identified himself as a member of the NAACP and described his efforts to promote voting in the City, as well as an affidavit from proposed intervenor Sharon Ferguson, a voter with no vehicle access who explained her difficulty in reaching the early voting polling places; she is also an NAACP member. As noted above, the timing of the motion is not ideal, and surely the better practice would have been for the proposed intervenors to seek intervention in Supreme Court shortly after commencement. Nonetheless, considering the well-documented history of this dispute, respondents cannot credibly claim surprise or prejudice arising from the assertions of either the NAACP or Ferguson specifically.
The proceeding will not be delayed, as the proposed intervenors have not sought an adjournment or to file a separate brief but have adopted petitioner's brief and arguments (see Jones v Town of Carroll, 158 AD3d at 1326-1328). Similarly, although anyone seeking to intervene must provide, with the motion papers, "a proposed pleading setting forth the claim or defense for which intervention is sought" (CPLR 1014; see Matter of Zehnder v State of New York, 266 AD2d 224, 224-225 [1999]), the proposed intervenors have indicated that they adopt petitioner's arguments, are generally seeking the same relief and their claim is fleshed out in letters — which [*4]are included in the record — that were sent to respondents by the NAACP and its coalition partners (see Jones v Town of Carroll, 158 AD3d at 1328). Under these circumstances, we exercise our discretion to grant the motion to intervene (see e.g. McDermott v McDermott, 119 AD2d 370, 374 [1986], appeal dismissed 69 NY2d 1028 [1987]).
The three individual proposed intervenors have standing in this matter as they are registered to vote in Rensselaer County, have expressed that they are interested in early voting and indicated that they would have difficulty reaching the current early voting polling places (see e.g. Matter of Krowe v Westchester County Bd. of Elections, 155 AD3d 672, 672-673 [2017]). The NAACP has established organizational standing to sue "[b]ecause one or more of its members would have standing individually to sue, the interests asserted herein are germane to its purpose and the participation of the individual members is not required" (Matter of Ziemba v City of Troy, 37 AD3d 68, 72 [2006], lv denied 8 NY3d 806 [2007]; see Rudder v Pataki, 93 NY2d 273, 278 [1999]). Having found that the proposed intervenors have standing, the case may proceed on the merits. Whether petitioner has standing is rendered academic (see Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 813 [2003], cert denied 540 US 1017 [2003]).
In reviewing the Board's designation of polling places, as with other administrative actions undertaken without a hearing, this Court "may not substitute its judgment for that of the agency responsible for making the determination, but must ascertain only whether there is a rational basis for the decision or whether it is arbitrary and capricious" (Flacke v Onondaga Landfill Sys., 69 NY2d 355, 363 [1987]; accord Matter of Beer v New York State Dept. of Envtl. Conservation, 189 AD3d 1916, 1918 [2020]; see CPLR 7803 [3]). When conducting this analysis, "we are mindful that judicial review of administrative determinations is generally limited to the reasons provided by the agency and to the facts and record adduced before the agency" (Matter of Hutchinson v Annuci, 189 AD3d 1850, 1854 [2020]; see Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of the State of N.Y., 16 NY3d 360, 368 [2011]; see also Matter of Montauk Improvement v Proccacino, 41 NY2d 913, 914 [1977]). However, an unsupported determination cannot stand. "Absent a predicate in the proof to be found in the record, an unsupported determination must be set aside as without rational basis and wholly arbitrary" (Metropolitan Taxicab Bd. of Trade v New York City Taxi & Limousine Commn., 18 NY3d 329, 334 [2011] [internal quotation marks, brackets, ellipses and citations omitted]).
Turning to the merits, in designating early voting polling places, the Board "shall have at least one polling place" in the City (as Rensselaer County's most populous municipality) and, because the City has public transportation, "such polling place shall be situated [*5]along such transportation routes" (Election Law § 8-600 [2] [a]). Election Law § 8-600 (2) (e) further states that any early voting polling place "shall be located so that voters in the county have adequate and equitable access, taking into consideration population density, travel time to the polling place, proximity to other early voting poll sites, public transportation routes, commuter traffic patterns and such other factors the board of elections deems appropriate" (see 9 NYCRR 6211.1 [c]).
The Board failed to issue any contemporaneous explanation as to how it settled upon the early voting polling places it selected in 2020 or 2021. It further claimed to have no records documenting its deliberations or review when it did so in 2020, a telling absence given the numerous communications to the Board from petitioner and others regarding the need for a polling place in the City, the unsuitability of Holy Cross for that site, and the potential for moving it elsewhere.[FN1] The Board also gave no substantive explanation when rejecting the entreaties of petitioner and others to site an early voting polling place at one of four proposed alternatives in the City in 2021. Instead, as noted by Supreme Court, the Commissioners merely made various assertions in a conclusory manner, lacking factual findings or bases to support their claims and ultimate determination that Holy Cross met "all [s]tate and [f]ederal guidelines . . . and continue[d] to be the best option for all residents of Rensselaer County."[FN2]
In attempting to explain their actions after the fact, the Commissioners baldly averred that they had considered all the statutory factors as part of a "rigorous process" to establish early voting polling places. Yet, they provided few specifics as to the information they relied upon or how any of the required factors supported their determination. For example, they broadly averred that, "[w]ith respect to travel times, proximity, transportation routes, traffic patterns, and other factors, [they] looked at and studied a map of Rensselaer County, and, as informed by [their] working knowledge of travel times, proximity, transportation routes, traffic patterns, population density, and other factors," divided the County in half and sought to locate one early voting polling place in each half. The source of their "working knowledge" is unclear; simply living in the locality or having previously been responsible for overseeing prior elections does not necessarily equate to adequate knowledge of things such as traffic patterns and population density.
The Commissioners mentioned specific factors that they considered, such as whether the suburban sites were on major thoroughfares and whether the selected locations had adequate parking. As for the Holy Cross site, they note that it has a large hall, is located four tenths of a mile from the City's largest public housing project, and is located on one major thoroughfare and adjacent to another major residential [*6]and commuter road. The Commissioners specifically rejected a proposed site in the City for, among other reasons, the lack of bus service directly in front of that site and that residents would have to walk several blocks to a bus stop. They otherwise referenced public transportation routes in conclusory fashion but notably failed to indicate how those routes impacted their selection of any early voting site or even whether the Holy Cross location was on or near one as required by Election Law § 8-600 (2) (a). In fact, the Holy Cross site does not appear to provide convenient access to public transportation for many residents. Moreover, one of the suburban sites is located nearly two miles away from the closest bus stop, requiring bus-riding voters to walk that distance along roads that, in some spots, do not have sidewalks.
Upon our review of the record, we conclude that the Board did not adequately address "whether the early voting site[s are] on or near public transportation" (9 NYCRR 6211.1 [c] [2] [iv]). The failure to address that mandatory factor "precludes meaningful review of the rationality of" the Board's siting determination, renders the decision arbitrary and capricious and, by itself, warrants annulment (Matter of Figel v Dwyer, 75 AD3d 802, 804 [2010]; see Matter of Acosta v New York City Dept. of Educ., 16 NY3d 309, 318-319 [2011]; Matter of Menon v New York State Dept. of Health, 140 AD3d 1428, 1430-1431 [2016]). The Board failed to meaningfully address most of the other factors as well. Accordingly, Supreme Court properly granted the petition and annulled the Board's determination designating early voting polling places for the 2021 election (see e.g. Matter of Krowe v Westchester County Bd. of Elections, 155 AD3d at 673).
We note that Supreme Court's June 7, 2021 judgment required respondents to select early voting polling places that comply with Election Law § 8-600 "by the earliest date practicable." On June 24, 2021, this Court vacated the statutory stay of that judgment. Nonetheless, there is no indication that respondents have complied with the judgment.[FN3] Accordingly, we find it necessary to set forth a deadline of September 3, 2021 for respondents' compliance.
Lynch, Clark, Pritzker and Colangelo, JJ., concur.
ORDERED that the motion is granted, without costs.
ORDERED that the judgment is affirmed, without costs, and, by September 3, 2021, respondents shall select early voting polling places for the 2021 general election that provide adequate and equitable access for all voters in Rensselaer County, including voters in the City of Troy, and otherwise comply with Election Law § 8-600.



Footnotes

Footnote 1: The Board affirmatively represented that it had no relevant documents in response to a Freedom of Information Law request by a coalition of community organizations (one of which is the NAACP) and petitioner's demand for documents related to its determination and consideration of any possible alternative sites for early voting. However, numerous documents in the record, including letters sent to the Board by the coalition, appear to be responsive to those requests.

Footnote 2: The Commissioners have stated that they received approval of their selected early voting polling places from the State Board of Elections. The record does not include any proof of such approval — aside from the Commissioners' affidavits — nor specify exactly what the State Board approved. Notably, Election Law § 8-600 (2) and related regulations do not require State Board approval of early voting polling places, except to assure that they are accessible to voters with disabilities (see Election Law §§ 4-104 [1-b], [1-c]; 8-600 [2] [e]; 9 NYCRR 6206.1, 6206.2, 6211.1 [c] [1]).

Footnote 3: The Board's website still lists the three prior sites and the Board's office as locations for early voting (see https://www.rensco.com/departments/board-of-elections/early-voting-information [last accessed Aug. 19, 2021]). In their submissions before this Court, respondents have represented that the Board's offices in the City provided residents with a fourth option for early voting, going so far as to represent that 93 voters cast their ballots at the Board's offices during the June 2021 primary. Notably, the early voting statute specifies that voters shall be able to cast their ballot in the same manner as on election day, i.e., by completing a ballot and by placing the ballot in a ballot scanner (see Election Law §§ 8-312 [1], [2]; 8-600 [6]). At oral argument, respondents' counsel confirmed that voters could obtain absentee ballots at the Board's offices during early voting hours, but regular in-person early voting was not available at that location during the June 2021 primary. Manifestly, providing an opportunity to apply for and complete an absentee ballot does not constitute early voting as defined by the statute, and respondents' argument to the contrary is misguided.